UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ADVANTAGE FUTURES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 2005 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| HERM LLC, JOHN CORBETT, JR., KATHRYN SERGIO, GEORGE SMITH, MARK SERGIO, BRUCE AI, JANICE C. MARSCHEL, as trustee for the Janice C. Marschel Revocable Trust, KEVIN SCHMIDT, individually and as trustee for the Janice C. Marschel Revocable Trust, BARBARA HERMAN, JEROLD HERMAN, DARCY FROST, and FRED FROST, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Advantage Futures LLC alleges in this diversity suit that Defendants breached their respective contracts with it by failing to pay off the negative balances that had accrued on their futures trading accounts. Doc. 11. After the court denied their motion to dismiss, Doc. 50, Defendants answered and asserted affirmative defenses, Doc. 52. Advantage moved under Civil Rule 12(f) to strike the affirmative defenses, Doc. 53, and the court granted Defendants' request for leave to amend, Docs. 61, 63. Advantage now moves under Rule 12(f) to strike the amended affirmative defenses. Doc. 66. The motion is granted.

**Background**

In resolving Advantage's Rule 12(f) motion, the court assumes the truth of the well-pleaded factual allegations in Defendants' pleadings, though not their legal conclusions, and draws all reasonable inferences in Defendants' favor. *See United States v. 416.81 Acres of Land*, 514 F.2d 627, 631 (7th Cir. 1975) (Clark, J.). The court must also consider "documents attached

1

to the [pleadings], documents that are critical to the [pleadings] and referred to in [them], and information that is subject to proper judicial notice," along with additional facts set forth in Defendants' opposition brief, so long as those facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Defendants as those materials allow. *See Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 682 (7th Cir. 2014). In setting forth those facts at this juncture, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Advantage is a futures commission merchant ("FCM") registered with the Commodity Futures Trading Commission ("CFTC"). Doc. 52 at ¶ 2. Defendants held futures trading accounts with Advantage. *Id*. at ¶¶ 4-14. An FCM like Advantage is required each day to post sufficient margin to the pertinent trading exchange(s) to cover its clients' obligations regardless of whether they have sufficient funds in their accounts with the FCM. *Id*. at ¶ 23.

When they opened their accounts, Defendants each signed a Commodity Futures Client Agreement. *Id*. at ¶¶ 16, 24. The Client Agreements are governed by Illinois law. *E.g.*, Doc. 11-1 at § 28. Section 3 required Defendants to pay Advantage "any debit balance or deficiency in [their] Account[s]." *E.g.*, *id*. at § 3. Section 10 required Defendants to "at all times maintain such margins and premiums … as required from time to time by Advantage," and to post margin at Advantage's demand, which could come with an hour's notice but also on shorter notice at Advantage's "sole and absolute discretion." *E.g.*, *id*. at § 10 (capitalization altered).

Section 12 provided that if Defendants failed to meet a margin call, Advantage had the rights to:

> cover or liquidate any position [Defendants] may have with Advantage
> (including but not limited to whole or partial liquidations of [Defendants']

2

> Account[s]; buying in property which [Defendants'] Account[s] may be short; the exercise of any option; or the straddling of existing open positions if they cannot be satisfactorily liquidated because the market is illiquid or has reached a price limit, or for any other reason); or … cancel any or all pending orders and refuse to accept new orders, all without liability on Advantage's party to [Defendants] or any third party.

*E.g.*, *id*. at § 12. Section 12 further provided that Advantage's remedies in the event of Defendants' failure to meet a margin call were "solely for Advantage's protection," such that its decision to use or not to use its remedies "shall not relieve [Defendants] of any of [their] obligations under [the] Agreement." *E.g.*, *ibid*. And Section 2 restricted Defendants' remedies in the event that Advantage violated any rule or law, providing:

> Advantage's violation of any rule or law shall not provide [Defendants] in any legal, reparation, arbitration or other proceeding with (y) a defense to a claim by Advantage for money or other property due under this Agreement or (z) a basis for a claim by [Defendants] that money or other property is due from Advantage, unless such violation has been determined to be in relation to a transaction that [Defendants] did not give instructions to effect and is the direct cause of [Defendants'] claimed indebtedness to Advantage.

*E.g.*, *id*. at § 2.

Defendants each entered into Commodity Futures Discretionary Trading Authorization Agreements with JBJ Capital Management Inc., which authorized JBJ to place and enter trades on their accounts. Doc. 52 at ¶¶ 17-19; Doc. 63 at ¶ 1; *e.g.*, Doc. 11-12. The JBJ Agreements provided that Defendants "will indemnify Advantage … and will pay Advantage promptly, on demand, for any losses arising from such trades and any debit balance due thereon." *E.g.*, Doc. 11-12.

Advantage alleges that on February 2, 2018, "the net liquidating value of several of … Defendants' accounts fell below" their margin requirements. Doc. 11 at ¶ 31. Advantage did not receive funds from Defendants to meet their margin requirements. Doc. 52 at ¶ 32. Advantage alleges that by February 6, 2018, Defendants all had negative balances in their accounts. Doc. 11

3

at ¶ 33. Advantage emailed Defendants to ask that they remedy their margin deficits. Doc. 52 at ¶ 34; *e.g.*, Doc. 11-23.

Advantage further alleges that on February 5, 2018, it "began closing out the positions" in Defendants' accounts and that it continued to liquidate the accounts given their failure to meet their margin requirements. Doc. 11 at ¶¶ 37-38. According to Advantage, most of Defendants' positions had been closed by the end of the day on February 6, 2018. *Id*. at ¶ 39. Advantage emailed Defendants to ask that they pay the negative balances and margin requirements, but Defendants failed to pay the full amounts owed. Doc. 52 at ¶¶ 40-41.

JBJ acted through Martin Dim, its sole shareholder. Doc. 63 at ¶ 2. According to Defendants, beginning as early as January 10, 2018, "Dim lacked understanding of the workings of [Defendants'] trading position[s] and lacked the sophistication to manage [them]." *Id*. at ¶ 9. Defendants interpret recordings of Dim's phone calls with Advantage to "reveal that Dim had a closer than arms-length relationship with" Advantage. *Id*. at ¶ 10 (internal quotation marks omitted). On a January 10, 2018 phone call with Advantage, Dim said, "I am at a loss here." *Id*. at ¶ 11. Beginning that day, Advantage helped Dim manage Defendants' accounts. *Id*. at ¶ 12. A week later, Dim seemed unaware of "what his position [was] or how to track it," asking an Advantage employee for assistance. *Id*. at ¶ 11. On a January 18, 2018 phone call, an Advantage employee coached Dim through a transaction—speaking in terms of what "we" should and would do—and rejected at least one of Dim's ideas. *Id*. at ¶ 14. Defendants contend that Advantage's employees continued over the next week to "tell Dim what he needs to do" and that "Dim still flounder[ed]," continuing to ask Advantage to "tell [him] what to do" because he did "not know how to get out of this loop." *Id*. at ¶¶ 17-18.

4

On January 30, 2018, Advantage told Dim, "Do not do anything without running it by us." *Id*. at ¶ 19. Advantage then began "pre-approv[ing] all trades" that Dim made. *Id*. at ¶ 20. On February 5, 2018, the day before Advantage liquidated Defendants' accounts, Advantage "ordered Dim to cover approximately 1600 short futures contracts." *Id*. at ¶ 21 (internal quotation marks omitted). Defendants claim that had Dim not complied with Advantage's order, "the position would have maintained a value of" $12 million rather than suffering a more than $25 million loss. *Id*. at ¶¶ 21-22.

Defendants allege that as of January 24, 2018, Advantage knew that they "could not satisfy a margin call with cash" and "allowed Dim to attempt to trade out of the deficit." *Id*. at ¶¶ 44-48. Had Advantage instead liquidated Defendants' accounts that day, Advantage would have lost the accounts, but Defendants would have had positive balances. *Id*. at ¶¶ 45, 47. Defendants allege that the net liquidating values of their accounts remained positive on January 30, 2018, when Advantage began requiring preapproval of Dim's trades while allowing the accounts to remain open. *Id*. at ¶ 49-51. Ultimately, Advantage permitted Defendants to continue trading until their net liquidating values were negative and Advantage's own funds were at risk, and only then did it liquidate their accounts. *Id*. at ¶¶ 52-53. Defendants characterize this decision as a bad faith exercise of Advantage's discretion over when to liquidate their accounts. *Id*. at ¶ 54.

## Discussion

The operative complaint alleges that Defendants breached Section 3 of their Client Agreements by failing to pay off the negative balances that accrued on their Advantage trading accounts. Doc. 11 at ¶¶ 30, 45. In defending against that claim, Defendants assert three affirmative defenses, Doc. 63, which Advantage moves to strike, Doc. 66. Under Rule 12(f), a

5

court may "strike from a pleading an insufficient defense." Fed. R. Civ. P. 12(f). "Affirmative defenses will be stricken only when they are insufficient on the face of the pleadings." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

## I. De Facto Control

The first affirmative defense alleges that Advantage took "de facto control" of Defendants' accounts, thereby causing them to fall into negative balances. Doc. 63 at ¶¶ 1-25. Advantage contends that de facto control is not a defense to a contract claim. Doc. 68 at 3-6. Defendants fail to respond to that argument or to cite any authority for the proposition that de facto control is a contract defense, Doc. 71 at 6-8, thereby forfeiting the point and that defense. *See Lee v. Ne. Ill. Reg'l Commuter R.R.*, 912 F.3d 1049, 1054 (7th Cir. 2019) ("[The forfeiture] rule applies when a party fails to develop arguments related to a discrete issue or when a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss."); *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) ("[A] party generally forfeits an argument or issue not raised in response to a motion to dismiss … ."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … ."). Accordingly, the de facto control defense is stricken.

## II. Unenforceable as Against Public Policy

The second affirmative defense alleges that the Client Agreements gave Advantage a "license to steal" and thus are unenforceable as against public policy. Doc. 63 at ¶¶ 26-39 (capitalization altered). Defendants focus on Section 2 of the Client Agreements, which stated:

6

> Advantage's violation of any rule or law shall not provide Client in any legal, reparation, arbitration or other proceeding with (y) a defense to a claim by Advantage for money or other property due under this Agreement or (z) a basis for a claim by Client that money or other property is due from Advantage, unless such violation has been determined to be in relation to a transaction that Client did not give instructions to effect and is the direct cause of Client's claimed indebtedness to Advantage.

Doc. 1-1 at § 2. According to Defendants, Section 2 allowed Advantage "to embezzle, steal from and otherwise defraud Defendants without recourse." Doc. 63 at ¶ 30.

Fairly read, the unenforceability affirmative defense presses two arguments. The first is that because the Client Agreements contain a provision that violates public policy, the Agreements in their entirety are unenforceable. That defense is meritless. The Client Agreements included this severability clause:

> If any term or provision of this Agreement is, or at any time becomes, inconsistent with any present or future rule or law or otherwise is invalid or unenforceable, the inconsistent term or provision shall be deemed amended or superseded to conform with such rule or law, but in all other respects this Agreement shall continue in full force and effect.

*E.g.*, Doc. 1-1 at § 2. Accordingly, even if Defendants were right that Section 2 violated public policy in some of its applications, it could be severed from the Client Agreements, allowing Advantage to enforce Section 3, the provision upon which its contract claim rests. *See Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 718 (N.D. Ill. 2014) ("Under Illinois law, a court may modify or 'blue-pencil' an unreasonable agreement in order to make it comport with the law, or sever unenforceable provisions from a contract.") (citing *Arpac Corp. v. Murray*, 589 N.E.2d 640, 652 (Ill. App. 1992); *Corroon & Black of Ill., Inc. v. Magner*, 494 N.E.2d 785, 793 (Ill. App. 1986)).

The second argument pressed by Defendants' unenforceability affirmative defense is that it would violate public policy to enforce Section 2 in the specific context of Advantage's claim against Defendants under Section 3. That is, Defendants contend that it would violate public

policy to hold that Advantage may pursue its Section 3 claim against Defendants to recover the negative balances in their accounts given that they accrued those balances due to Advantage's violations of CFTC regulations and National Futures Association rules governing margin requirements. Doc. 63 at ¶¶ 31, 36. In its initial brief, Advantage argued that its alleged violation of those rules and regulations is not a defense to a contract claim, and therefore that the Client Agreements' provisions prohibiting that (nonexistent) defense cannot violate public policy. Doc. 68 at 9-10. Defendants cite no authority for the proposition that regulatory violations provide a contract defense, thereby forfeiting the point. *See M.G. Skinner & Assocs. Ins. Agency v. Norman–Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

In any event, Advantage is correct on the merits. In *ADM Investor Services, Inc. v. Collins*, 515 F.3d 753 (7th Cir. 2008), the Seventh Circuit held that an FCM's customers (here, Defendants) must pay for losses to their accounts even if the FCM (here, Advantage) violated its regulatory obligations concerning margin-posting requirements in connection with accepting the customers' orders. *See id.* at 755-57 (holding that the defendant investor could not raise as a defense the plaintiff FCM's violation of margin requirements). Defendants suggest that the understanding of the futures markets upon which *ADM* premised its holding did not survive enactment in 2010 of the Dodd-Frank Act, which reflects a recognition that an FCM's failure to protect against the risk of defaulting customers may have systemic effects on other customers, market participants, and financial institutions. Doc. 71 at 1-4.

That argument fails on two grounds. First, this court is bound to follow *ADM* unless and until it is overturned by the Seventh Circuit or the Supreme Court. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("In a hierarchical system, decisions of a

superior court are authoritative on inferior courts. Just as the court of appeals must follow decisions of the Supreme Court whether or not we agree with them, so district judges must follow the decisions of this court whether or not they agree.") (citations omitted); *A Woman's Choice–E. Side Women's Clinic v. Newman*, 305 F.3d 684, 687 (7th Cir. 2002) ("[O]nly an express overruling relieves an inferior court of the duty to follow decisions on the books."). Second, and in any event, the Dodd-Frank Act did not innovate the notion that an FCM's failure to protect against the risk of defaulting customers could impact other customers, market participants, and financial institutions; that notion, rather, predated Dodd-Frank. *See Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 190 (7th Cir. 1992) ("Margins are accorded a special status in the regulatory scheme of the Commodity Exchange Act so that futures commission agents are able to assure their own financial integrity, which, in turn, contributes to the financial integrity of the entire marketplace."). Thus, both before and after Dodd-Frank, the mere fact that a "balky customer[ ]" is not just a customer, but also a market participant who may be impacted by the systemic risks caused by the customer's own default, does not mean that such "a customer's failure to post required margin … excuse[s] him from paying." *Id*. at 757. The public policy defense accordingly is stricken.

### III.  Implied Covenant of Good Faith and Fair Dealing

The third affirmative defense alleges that Advantage breached the implied covenant of good faith and fair dealing by waiting to liquidate Defendants' accounts until "the[ir] net liquidating value became negative"—that is, until Advantage's own funds were placed at risk. Doc. 63 at ¶¶ 40-60. Advantage responds that it acted within its "broad discretion" under the Client Agreements to protect its assets and that the implied covenant cannot override the Agreement's express terms granting it that discretion. Doc. 68 at 11-14. Defendants acknowledge that Advantage "ha[d] discretion [under the Client Agreements] as to the

9

liquidation of under-margined accounts," but assert that Advantage breached its duty to act in good faith in exercising that discretion. Doc. 71 at 11-12.

The implied covenant of good faith and fair dealing is merely an interpretive rule; it cannot override a contract's express terms. As the Seventh Circuit has explained, "[p]arties to a contract … are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract." *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 462 (7th Cir. 2014) (quoting *N. Tr. Co. v. VIII S. Mich. Assocs.*, 657 N.E.2d 1095, 1104 (Ill. App. 1995)); *see also McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013) ("The obligation of good faith and fair dealing is used as an aid in construing a contract under Illinois law, but does not create an independent cause of action."). Because the Client Agreements gave Advantage the right to liquidate Defendants' accounts if they failed to meet their margin calls and expressly provided that Advantage's "non-resort or partial resort" to that remedy—which was "solely for Advantage's protection"—"shall not relieve [Defendants] of any of [their] obligations under this Agreement," *e.g.*, Doc. 11-1 at § 12, the implied covenant is legally unavailable to Defendants in defending against Advantage's Section 3 claim. *See Goldberg*, 755 F.3d at 462.

Defendants got exactly what they bargained for when Advantage waited to liquidate their accounts until it concluded that doing so was in its own financial interest. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'"). Accordingly, the implied covenant of good faith and fair dealing affirmative defense is stricken.

**Conclusion**

Advantage's motion to strike is granted. Given the substantial overlap between Defendants' original and amended affirmative defenses, as well as the similarity of Advantage's arguments in its serial motions to strike the original and amended defenses, Docs. 53, 66, Defendants undoubtedly put forward their best effort in the amended affirmative defenses. The amended defenses accordingly are stricken with prejudice, and Defendants will not be given an opportunity to replead. *See Agnew v. NCAA*, 683 F.3d 328, 333-34, 347-48 (7th Cir. 2012) (affirming the district court's denial of leave to file a second amended complaint, even though the claims had not previously been dismissed, because the plaintiffs "already had the opportunity to amend their complaint after being exposed to the [defendant's] arguments" via an earlier motion to dismiss).

August 8, 2019

_____
United States District Judge